Good morning. May it please the court. My name is Jessica Hathaway. I represent Mr. Daniel this morning. My intent is to focus on the first two points of the appeal, unless of course the court has questions about the second two points. And just briefly, in a to explain what the case is about a bit. My client is alleged to have assisted in a robbery of a small store in I believe Perryville, Missouri, by agreeing to serve as a getaway driver with, importantly, advanced knowledge that his confederate would use a weapon in that robbery. Now, the first sufficiency count concerns the section 924c count of this crime, and that requires generally using a weapon during, in relation, or in furtherance of a crime of violence, which robbery would be. The result in this particular opinion is governed by Rosemond v. United States, which put a heightened burden on the government to demonstrate evidence, demonstrate through evidence, that Mr. Daniel, as an aider and abetter, had advanced knowledge that his confederate would use a weapon. And here we allege there was insufficient evidence to demonstrate that he knew of that. So to meet his heightened burden, the government attempted to link a gun that was found in Mr. Daniel's car to the gun that was used in the robbery. And just briefly, after the robbery was completed, the robber himself escaped through a back door. The robbery victim saw the robber walking across a field, saw the robber enter a car, and in search of that car, deep in a console, the police found a black 9-millimeter. And the record will show to find that it required taking drinks out of a drink holder, opening sort of a piece of the car that held the drink holders, and finding this 9-millimeter stored deep within that. Was there sufficient time for that to happen? That's arguable. It was so quickly that these particular robbers were, that this particular robber was apprehended. It took a matter of something like, I believe, four minutes. It was a matter of minutes after the robbery. And that will go to my second point as well later. But in order for that to happen, in order for concealing that weapon so quickly to happen, the two gentlemen would need to remove these styrofoam drinks. So they were drinks that could have spilled if you were moving them? They weren't? They weren't cans or anything like that. They were the sort of 7-Eleven style styrofoam cups with lids that they would have need to, full of soda, I believe, that they would have needed to take out, lift this piece of the car out, stow the weapon into the actual dashboard, and then return it, and then put their drinks back in. And tellingly, Mr. Gibson, the robber, had simply tossed, apparently, the proceeds of the robbery, which was a wallet, one of the things was a wallet, into the backseat. So he would have needed to very elaborately hide the weapon, which would be incriminating had he used it in the robbery, and then sort of casually dispose of other items that would also be that way. Were there any fingerprints? Did anybody test fingerprints? Or could you test fingerprints on the cups, drink cups? The United States Attorney might have to correct me on this. I don't believe that happened. I don't believe that. I know there was no fingerprints presented. But I don't know from the record if that was actually done by law enforcement. So to meet its burden, the government attempted to kind of construct this chain of inferences, which would be because there was a black gun in the car, that they incidentally were able to link to Mr. Daniel through his uncle. I think someone sold the gun to his father. And the car, notably, actually belonged to Mr. Daniel's girlfriend. So the gun itself is attenuatedly connected to Mr. Daniel. And again, the government asked the jury to infer that, based on the fact that this gun was clearly used in the robbery, that Mr. Daniel must have had advanced knowledge, that it was more than just a, okay, I'll agree to drive you away from the scene. It was that here's a gun, you can please use this in the robbery, or at least some sort of knowledge. So, I mean, that brings us to the peculiar facts that came out at trial about this gun. Robbery victim was caught very surprised, you know, very shockingly, I would imagine, while she was cleaning up the store after hours, it was something like 11 o'clock or midnight. She was putting things away. And then this person enters the store and robs her. She thought it was a joke. I mean, she's like, what's happening? Put a gun to the back of her head, is that what you're calling? She testified that he put his arm around her, the gun was in her back. And then later, as he was leaving the scene, that she did see the gun. And she testified numerous, well, there was a 911 call. And just a minute or so into that 911 call, she describes the gun as a silver handgun. She says that she saw it. She doesn't equivocate on that at all. And then later, when the police arrive, she also gives them information and describes it as a silver gun. Was she ever confronted with the appearance of the gun that was found in the car? The record doesn't reflect that. You can tell a little bit from the record, from her testimony. Of course, she's the victim. So she was likely there, I believe. But it, you know, she was aware what the gun, the color of the gun was found, but she stuck with what she saw. You know, she, after she was called at trial, she testified, I believe it's quoted in my reply brief, question about that, what color was the gun? I saw a silver gun. I believe the United States attorney attempted to, you know, question that with her a little bit, not aggressively, but, you know, what part of the gun did you see? I saw the barrel. At one point, she says she saw the tip of the gun. And across examination, she affirms numerous times that it indeed was that she did see a silver gun. And that's what she saw. So she never contradicted herself at all, other than to at one point, concede that she didn't see the entire gun. She didn't see the side of it. She saw it from the front as he was leaving. So, so there's nothing in the record to indicate that the gun that was found could not have been the gun at the robbery, other than the discrepancy between the colors. Yes. The evidence that was put on by the eyewitness was that it was a silver gun. She never at any point says, well, it still photograph of the surveillance camera. And then as its exhibit, which it's filed with this court, there's a video and it's very short. It's only about 20 seconds. How was that presented to the how was it presented to the jury in closing argument regarding the gun identification? Um, the government argued essentially that the video, the jury was able to view the video and essentially argued that the robbery victim was mistaken, that she likely, you know, a black millimeter is usually sort of a matte black. The he argued that the government, the United States attorney argued that she might've seen a reflection of light on the gun. Um, she, she never indicated that she didn't show any sort of, uh, doubt at any time that I could tell from the record. I know it's a little hard to tell from the record for the court, but she didn't appear to ever contradict herself. Um, was there any, uh, evidence or testimony about the possibility of another gun? No. Um, there is some evidence that they did search for a silver gun after she told them it was silver. Um, the evidence in the records, they looked, I believe for about 15 minutes in the field that, um, the robber crossed in order to reach a road where the vehicle was. So they, I didn't believe from the record that this showed that they exhaustively searched. Um, I don't know. Um, my colleague might be able to correct me on this, but I don't believe the record shows that they searched through any trash cans. She didn't see him do the, do that. The natural inference would be disposed of the gun at some point as he was walking away. So would it be accurate to say that the jury made a factual finding that the gun in the car was the same gun used in the robbery? Correct. And our contention is that, you know, of course the jury's fact determination is entitled to a large amount of deference from this court. It's rare to reverse for sufficiency of the evidence. The court does do it from time to time. And, um, the best analogy I could give is that, um, this case would have some similarity to, and I couldn't find a case like this, unfortunately, but where a video that, you know, the court can see with its eyes would contradict what a witness said he or she saw. Um, we don't have that. I mean, do we, the, the, the video is, I don't, I find, found it difficult to, to determine even where the gun was. Correct. Um, I thought the video, if, if there was a dispute about whether the robbery occurred, if there was a dispute about his positioning, if there was a dispute about, um, things like that, it would be probative on that issue. Certainly. On the issue of what, whether he had, I mean, you can tell by his arm that he has a weapon, I believe. I think you could reasonably infer from that. But as far as what the gun looks like, I think it's, it's almost as if it doesn't exist. It has such low probative value and that leaves. So I suppose that's my point as far as the idea that, you know, if the court had, uh, conclusive video evidence and contradictory testimonial evidence, um, you could certainly affirm. Here we have a video that essentially shows nothing, has no probative value at all. And I don't know how to characterize that. Otherwise, I think it's just objectively that you cannot see, um, anything. And then the only other evidence is being something that completely is I think I will talk for just a couple of minutes about the Hobbs Act, um, jurisdictional claim. And just to speak briefly about the somewhat peculiar facts about this case that would set it apart from some of this court's other precedent that goes back to Farmer. And that is that the timing, you know, this was Dobbs happened while the store was open. You know, the store was forced to be there. Their actual commercial activities were interrupted here. Also, the money was gone for a very short amount of time, as well as the witness actually affirmatively stating that this store manager saying this has no effect whatsoever on our business. So on those grounds, I would argue it's distinguishable and reaches that less than de minimis effect on interstate commerce that this court would look for. Mr. Sorrell. May it please the court. My name is Keith Sorrell, and I'm an assistant United States attorney in Cape Girardeau, Missouri, and I participated in the trial of the case that's currently before the court. Um, if I may, I'll start off with the same issue that council has as far as the color of the gun and whether there was sufficient evidence to convict Mr. McKean. Daniel. And of course, the color of the gun was only one issue before there are one fact that was before the jury. There were several other facts that came into play. The jury heard and resolved all those issues that resolved them adversely to Mr. Daniel, but dealing with the color of the gun. One of the questions that came in was how was that presented in closing argument? How was it developed? The color of the gun was an issue that was developed all through the trial. Mr. Welby, who was trial counsel, argued that and presented evidence to the effect that called it. Talk to all the officers, questioned them about the color of the gun, whether they search for a silver gun. Did they find a silver gun? How long did they look and went through that in quite a bit of detail? And his closing argument, Mr. Welby probably spent 8 to 10 minutes. The first part of his argument arguing that the gun that was used by Mr Gibson and this robbery was a silver gun. And yet the evidence was in front of the jury for for them to resolve. And I did play the tape of the robbery. As you've noted, it's very short, but to play the tape of what was actually what they could actually see. Now, the object in that poor clerk's back was certainly not silver. It's difficult to tell what it is. The film is grainy, as most of those small convenience stores are. They don't have really high quality surveillance equipment. But it's clear to see that the object that was in his hand was black and not silver. The other thing is the witness clearly testified. Miss Course testified that she only saw the tip end of the gun, the barrel end of the gun. It was a high point pistol. And I showed it to the jury at the end where I put my hand around the barrel where only the tip was showing and displayed it. And it was a hard finish, a hard, flat finish that would reflect light. And it's possible that she simply saw a reflection of light and thought it was chrome or silver. But she also described it as dark in her testimony right after she said that she saw the tip end of the gun. She said it was dark. And so, again, that was just a fact that was in front of the jury. The government's theory was that it was the gun that was found in the console of the car. That gun. We argued it that way. So if if there wasn't sufficient evidence to show that that was the gun that Mr. Gibson had used in a robbery, then then that count would fall, correct? It would. But the weighing of that evidence is for the jury that we don't reweigh the evidence in this particular transaction or this appeal. And was there any evidence? And I asked your opposing counsel about any evidence or testimony or possibility theory presented to the jury about another gun. No, there wasn't. There was only this one piece of evidence. We played the 9-1-1 call where the miscourse reported that she had been robbed. It was a victim of an armed robbery that the robber had a silver gun. And that was all played for the jury. All this was played out in front of the jury for them to hear. We did not display the gun to miscourse, did not ask Mr. Welby, didn't either. Quite honestly, I thought that might be somewhat prejudicial because I think she might be expected to recognize the tip end of that gun. And I didn't want to do that. I thought that might be stretching what would be permissible because she told us in interviews she was not a gun expert, didn't know whether it was a revolver or a pistol, didn't know anything about it. And so we thought that would be stretching the bounds of what we ought to try to put on. And I think Mr. Welby thought the same thing. But what about the theory of near impossibility of the timing that you get back in a car, you toss the proceeds in the back and you remove two big drinks that are full of presumably, I don't know if there's testimony, are they full of drink? Yes. Full of liquid. And you move them and somebody's got to hold them while the other guy's driving and you lift up the console and somehow you dig down. Yes. It was four to five minutes between the robbery and the time the car was stopped. And yet that cup holder lifted directly out. The officers testified how they pulled it out. It would have been very easy for the driver, Mr. Daniel, to pull the cup out and Mr. Gibson to do the remainder and put the gun in the hole. The whole piece pulls out with anything that is. Yes. Yes. It just lifts completely out in one unit. This was a standard design. It is not a some kind of modified. I thought it had been modified, but I actually contacted a Chevrolet dealer who told me that's the way it was made. And so I was surprised to find out that's actually the the way the cup holder came from the factory. So it wasn't a special design, that's just the way it was. And so I understand there were no no fingerprint evidence presented. Were there effort? Was there any effort to do fingerprints on the gun that was found? There was not. And mainly because of the fingerprint evidence we found is very difficult to obtain from firearms as well as DNA evidence. Sometimes it happens, but the chemicals that are on guns for cleaning and taking care of them basically destroy a lot of times the DNA. And there aren't enough flat surfaces to to really to get a usable fingerprint. We've had very poor results. It happens on occasion, but we did not do that in this case. In any event, the jury did hear all of that evidence from both sides. Mr. Welby actually did a very good job of exploring that silver gun, black gun dichotomy. He did as much as anyone possibly could. But 12 jurors unanimously found that it was that that was this gun used by Mr. Gibson and furnished by Mr. Daniel. But so that that issue, as it turns out, to be a credibility issue. Or a weighing of the facts should be resolved by this court to be left in the hands of the jury. Can I ask you about the Hobbs Act robbery? But the case law seems pretty clear that the fact that it's a mom and pop convenience store is not doesn't necessarily take it out of the scope of the act. But what about this case here where you actually have testimony that there was no effect? I mean, does this push does this type of case push the act into the realm of simply if if a store does anything in connection with interstate commerce and then is is robbed, that that's sufficient? Is that is that sort of where we've gotten to with that statute? Well, if I may just refer back to the statute itself, because the statute says whoever in any way affects commerce. And so that has to mean something. Right. So it has to affect. Right. So the verb there is affect interstate commerce. And I understand it's de minimis. It's in any way. I just I just wonder if this one is pushing, pushing it up against the limit. But it's no different than Farmer, where there was a series of basically small convenience stores that were robbed or the other cases that we cited, Dobbs. There are numerous cases within this circuit, not looking even at other circuits where mom and pop stores, the robbery of those stores has been found to affect interstate commerce. And if I may add, when people go in to rob these stores, they're not stealing the goods on the shelves that go through interstate commerce. They're stealing the money. And so the issue is always, well, is it the proceeds that are can can be shown to affect interstate commerce? And the case I had before this court, United States versus Darryl House, said, yes, that stealing that robbing a business of its proceeds is a Hobbs Act violation. And so and this this may be the way the the act is applied. But I struggle to find or to think of a commercial enterprise of any sort that would not fall within the scope of the statute if you rob a business. I agree that it's very difficult to conceive. We were actually arguing about that in the in preparing for this case. What if the person stole a piece of bubble gum? But I don't think it's the article that was stolen. It's how that business affects commerce. And I guess that that sort of is the back door of that question, which is I can't imagine. Well, I don't know. Can you think of a of a business of any small or large that wouldn't be potentially subsumed by the statute? I don't know. It's a sawmill cutting timber in southeast Missouri. I would say would not because they're just selling timber to a person who buys it from Missouri. But they they use cash. You've just said it's just it's just stealing the cash and they probably use some kind of tools and equipment to cut up the lumber that certainly wasn't. Well, I don't know. Certainly likely wasn't all manufactured. I'm kind of just pushing it to the edge here because I'm just struggling to find to think of an example where where the where the Hobbs Act would. Right. I understand. It's just that in the parameters of this case, it seems clear that a mom and pop store clearly falls within the parameters of the act and that this robbery was clearly a Hobbs Act permissible, a permissible charge to make under Hobbs Act and that there's really no room for Mr. Daniel in this case, while there may be in other cases. And I would venture to say that a lot of that is going to fall to our discretion because we're not going to charge a Hobbs Act case where where that's going to be a legitimate issue. I mean, we're not going to get so close to the edge that you folks can push us off. I would hope that we wouldn't. And and I would hope that we would exercise that discretion not to do so. But in this case, with all the items that were that were manufactured and sold and transported interstate commerce, the gas, the cigarettes, the liquor, almost every item in that store came from a location outside the state of Missouri. And so I would argue that the question is, how did this robbery affect interstate commerce? Well, in that the fact that the in terms of the actual effect of the robbery, it affected just like it did in Farmer and Dobbs. When the proceeds of those stores were stolen for businesses that affected interstate commerce. In exactly the same way, in fact, in the last robbery and farmer, it was an attempted robbery. He was caught before anything was taken, caught actually in the store. And so to that extent, there was no effect at all because no money was taken. Nothing was taken. But yet that was a permissible. That was a chain case, wasn't it? But they looked at each individual store. They looked at where their supplies came from and and resolved it on the basis that their inventory came from other states. And and that's been true in every one of these Hobbs at cases that come before this panel. And this court is that they are. The proof is in the nature of where the goods come from that the store sells that that's how they're proven. That's how it's been accepted in numerous cases before. And we would argue should continue to be so, even though that does, as Judge Kelly pointed out, sort of expand the burden or expand the parameters of what is a permissible Hobbs at robbery. If I could address one further issue and that's the jury instruction, the committed or the committing complete argument that was made, the argument that counsel for Mr. Daniel made was that that there ought to be some limit on what the jury should consider that basically the instruction was improper because we should have used the word committing rather than complete in the aiding and abetting instruction. And inferring that you shouldn't really, the jury shouldn't be allowed to to look at facts beyond the scope of the robbery itself. Once the robbery is complete, well, then that's that's it. But Rosemond actually settles that in footnote number nine. And in that case, it talks about what the jury can consider says, of course, if a defendant continues to participate in a crime after a gun was displayed or used by a Confederate, the jury can permissibly infer from his failure to object or withdraw that he had no such that he had such knowledge in any criminal case. After all, the fact finder can draw inferences about a defendant's intent based on all the facts and circumstances of a crimes commission. And so Rosemond tells us that all those facts are to be considered what the color of the gun, how it was found, where it was found, what opportunity the people had to dispose of it. All those things come into evidence in determining, did Mr. Daniel know before the robbery that Mr. Gibson was going to use the farmer? And it uses it in past tense, that the jury can consider those things after the gun is displayed or used. Again, affirming the jury instruction used by the model instruction used by the Eighth Circuit, that the jury can make those inferences based on all the facts after the robbery is complete. I just wanted to address that one additional topic, if I may. If there are, excuse me, if there are no further questions, I'll tender back for the remainder of my time. Thank you. Thank you, Mr. Sorrell. Ms. Hathaway? Excuse me. Just to address briefly the idea that this was so exhaustively discussed at trial, I would argue that that's always going to be the case where this court is presented with a very close issue like this. This is a, I would say, a very, very arguable, and I would say meritorious, sufficiency claim. And in those cases, it's always going to be very, in most cases, very aggressively argued in the trial court. On the Hobbs Act? As far as the Hobbs Act issue... Counsel, you have a question?  Yeah, I was... I'm so sorry. My recollection is that the $349 or $69, whatever it was, was retained by the government pending the prosecution. Is that legally significant because that $369 is then taken out of interstate commerce? I didn't glean that from the record, Your Honor, but I would defer to what the record says. My impression was that it was not clear from the record when the money was returned. And so I see I'm actually running out of time. Yeah, I wasn't quite sure either. I thought that's what it was, and so that's why... All right. Thank you, Your Honor. Thank you, Ms. Hathaway. Thank you also, Mr. Sorrell. We will take your case under advisement, render decision in due course. Thank you. You may be excused.